IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| WILLIAM BRADLEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 12-1138-JAR |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of the final decision of Defendant Commissioner of Social Security denying Plaintiff William Bradley's applications for disability benefits under Title II of the Social Security Act,[1] and supplemental security income benefits under Title XVI of the Social Security Act.[2] Because the Court finds the Commissioner's decision was not supported by substantial evidence, the Court reverses and remands the case to the Commissioner.

**I.  Procedural History**

In September 2008, Plaintiff applied for disability, disability insurance benefits, and supplemental security income, alleging an onset date of January 1, 2007. Plaintiff's application was denied; Plaintiff timely requested a hearing before an administrative law judge ("ALJ"). After a hearing, the ALJ issued a decision finding that Plaintiff was not disabled. Plaintiff

---

[1] 42 U.S.C. §§ 401–434.

[2] 42 U.S.C. §§ 1381–1383f.

appealed, and the Appeals Council remanded the case to the ALJ.[3] After another hearing, the ALJ again issued a decision finding that Plaintiff was not disabled. Plaintiff again appealed, and the Appeals Council denied Plaintiff's request for review of the ALJ's second decision. Plaintiff then timely sought judicial review before this Court, pursuant to 42 U.S.C. § 405(g).

## II.     Standard for Judicial Review

Under 42 U.S.C. § 405(g), the Court reviews Defendant's legal conclusions *de novo* and affirms Defendants factual findings only if they are supported by substantial evidence in the record as a whole.[4] The Tenth Circuit has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] In the course of its review, the court may not re-weigh the evidence or substitute its judgment for that of Defendant.[6] The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."[7] "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."[8]

---

[3]The Appeals Council, on remand, directed the ALJ to give further consideration to Plaintiff's maximum residual functional capacity, evaluate the nontreating source opinions, evaluate Plaintiff's subjective complaints, evaluate the third party statement, obtain additional evidence concerning Plaintiff's mental impairments, obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base, offer Plaintiff an opportunity for a hearing, and to take any further action needed to complete the administrative record and issue a new decision.

[4]*See White v. Massanari*, 271 F.3d 1256, 1257 (10th Cir. 2001) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994)).

[5]*Id*. (quoting *Castellano*, 26 F.3d at 1028).

[6]*Id.*

[7]*Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

[8]*Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (citing *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988)).

**III.     Legal Standards and Analytical Framework**

Under the Social Security Act, "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."[9] An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[10]  The Secretary has established a five-step sequential evaluation process to determine whether a claimant is disabled:

> Step one: The ALJ examines whether the claimant is currently engaged in substantial gainful activity.
> Step two: The claimant must prove that they suffer from a severe impairment.  A severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activity.
> Step three: The ALJ determines whether the claimant's severe impairment meets or equals the impairments and the duration requirements in Appendix 1 of 20 C.F.R. and if it does, the claimant will be found disabled.
> Step four: The ALJ determines whether a claimant can perform his or her past relevant work—if so, he or she is not disabled.
> Step five: The ALJ considers a claimant's RFC, age, education and past work experience to determine if claimant is capable of performing other work in the national economy.[11]

If the ALJ determines the claimant is disabled or not disabled at any step along the way, the evaluation ends.[12]

---

[9]42 U.S.C. §§ 423(d)(1)(A); 416(I); 1382c(a)(3)(A).

[10]*Id.* §§ 423(d)(2)(A); 1382c(a)(3)(B).

[11]*Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1983) (citing 20 C.F.R. § 416.920(a)).

[12]*Id.*

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity[13] since January 2, 2007, the alleged onset date. At step two, the ALJ found that Plaintiff has medically "severe" impairments of major depressive disorder and borderline intellectual functioning. At step three, however, the ALJ determined Plaintiff's impairment is insufficient to meet the listing for any mental impairment. At step four, the ALJ found that Plaintiff's residual functional capacity (RFC) showed that he could perform past relevant work, rendering him not disabled. At step five, the ALJ concluded that Plaintiff is capable of performing other work in the national economy. Plaintiff challenges the ALJ's determination at steps three, four, and five. Underlying these challenges, Plaintiff alleges three factual errors: (1) the ALJ improperly relied on tests designed to detect malingering; (2) the ALJ improperly disregarded Dr. Schell's opinion because it was based on Plaintiff's subjective complaints; and (3) the ALJ improperly dismissed results from an IQ test administered by Dr. Smith.

## IV.   Discussion

The ALJ determined at step three that Plaintiff's mental impairments either singly or in combination did not meet or medically equal the criteria of listings 12.04 (Anxiety Related Disorders),[14] or 12.09 (Substance Addiction Disorders).[15] But the ALJ did not evaluate whether Plaintiff's impairments met or equaled the listing at 12.05 (Mental Retardation),[16] and Plaintiff alleges that the ALJ erred in not finding that his impairments meet or equal the listing at 12.05.

---

[13]*See Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).

[14]20 C.F.R. Pt. 404, subpt. P., app. 1, §12.00D(6)(c), Listing 12.04.

[15]*Id.*, Listing 12.09.

[16]*Id.*, Listing 12.05.

4

That listing states in pertinent part,

> Mental Retardation:
>   Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C , or D are satisfied.
> . . .
>   C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Plaintiff has the burden at step three to demonstrate through medical evidence that his impairments meet all the criteria in the listing.[17]  As the Tenth Circuit explained in *Lax v. Astrue*,[18] to meet listing 12.05C, a claimant must meet three criteria: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period (this criterion is based upon the capsule definition in the introductory paragraph); (2) a valid verbal, performance, or full scale IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.

Defendant does not challenge that Plaintiff has a physical or other mental impairment imposing an additional and significant work-related limitation, and there is substantial evidence that Plaintiff does meet this requirement; at step two, the ALJ found that Plaintiff has the severe impairment of major depressive disorder.  Defendant maintains that there was no evidence suggesting that Plaintiff met the first or second criteria.

---

[17]*Riddle v. Halter*, 10 F. App'x. 665, 667 (10th Cir. 2001) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

[18]489 F.3d 1080, 1085 (10th Cir. 2007).

### A. Mental retardation manifesting before the age of 22

To be sure, under Listing 12.05C, Plaintiff must prove that he has significantly subaverage general intellectual functioning with deficits in adaptive functioning and that this initially manifested before age 22.[19] Defendant argues that although the ALJ failed to evaluate whether Plaintiff's impairments met or equaled the listing at 12.05, this was not error, because there was no evidence that Plaintiff was *diagnosed* with mental retardation prior to the age of 22. But this argument relies on a legal error—there simply is no requirement that the IQ scores within the stated range must have been taken during the claimant's developmental period, just that the significantly subaverage general intellectual functioning with deficits in adaptive functioning initially *manifested* before age 22.[20]

Although the Tenth Circuit has not squarely ruled on the issue, it has noted that other circuits have liberally construed the early manifestation requirement to not require a claimant to affirmatively prove mental retardation prior to age 22, if there is no evidence that his IQ has changed.[21] The Eleventh Circuit, for example, presumes that "IQ remains fairly constant throughout life,"[22] as do the Seventh and Eighth Circuits.[23] The Fourth Circuit has noted that the absence of IQ testing during the developmental period does not mean that the mental retardation

---

[19]20 C.F.R. Pt. 404, subpt. P., app. 1 §12.00D(6)(c), Listing 12.05.

[20]65 Fed. Reg. 50,746-01, 50,753 (Aug. 21, 2000) (permitting the Commissioner to use current evidence to infer when the impairment began).

[21]*See McKown v. Shalala*, No. 93-7000, 1993 WL 335788, at *3 (10th Cir. Aug. 26, 1993); *see also Munzert v. Astrue,* 502 F. Supp. 2d 1148, 1152–53 (D. Kan. 2007); *Soverns v. Astrue*, 501 F. Supp. 2d 1311, 1320 (D. Kan. 2007).

[22]*Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001).

[23]*Guzman v. Bowen*, 801 F.2d 273, 275-76 (7th Cir. 1986); *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001).

did not manifest before the age of 22.[24]  And, the Fifth Circuit has relied upon later IQ testing as evidence that a defendant had significant subaverage intellectual functioning that manifested during the developmental stage.[25]

The Court accepts as the rule that a claimant's later IQ test in the requisite range, absent evidence of a change in IQ, allows the Court to infer that the claimant's IQ was within the requisite range before the age of 22. Here, to meet the criteria of Listing 12.05C, a claimant must present evidence that Plaintiff has a verbal, performance or full scale IQ score in the range of 60 through 70. In IQ tests administered by Drs. Smith and Moeller, Plaintiff's IQ scores were 70 or below on at least one of the three scales. In July 2008, Dr. Smith administered an IQ test, which resulted in a verbal score of 79, a performance score of 70 and a full scale score of 67. And in August 2010, Dr. Moeller administered an IQ test which resulted in a verbal score of 56, a performance score of 59, and a full scale score of 53. Both of the tests administered by Drs. Smith and Moeller meet the Listing 12.05C criteria, for only one of the three scores, verbal, performance, or full scale, needs to be in the requisite range. Listing 12.00 (for all mental disorders) directs that "[i]n cases where more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."[26]  Thus, there is IQ testing evidence from which it can be inferred that Plaintiff had IQ scores within the requisite range

---

[24]*Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985).

[25]*Morris v. Dretke*, 413 F.3d 484, 487 (5th Cir. 2005) (finding IQ scores obtained after the defendant was eighteen were probative on issue of whether he manifested significantly subaverage intellectual functioning before that age.)

[26]20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(d).

before the age of 22.[27]

Even if the Court were to adopt a different rule, such that a claimant must provide evidence beyond IQ tests taken after the claimant was 22 years old demonstrating that he had significant subaverage intellectual functioning that manifested during the developmental stage, Plaintiff has also met that burden. In both of his hearings before the ALJ, Plaintiff testified that he dropped out of school in ninth or tenth grade and that he had been in separate special education classes throughout primary and secondary school.[28] This is consistent with history Plaintiff gave his doctor.[29] And, aptitude testing by Dr. Schell demonstrated that, as an adult, Plaintiff has a second grade equivalency level for spelling and fourth grade equivalency level for arithmetic and reading.[30] This is the type of probative evidence that demonstrates that a claimant meets the first criteria under Listing 12.05.[31] To the extent that the ALJ believed more evidence was necessary, the ALJ had the duty to develop the record by seeking to obtain school records and/or earlier medical records for Plaintiff and must do so on remand.[32]

---

[27] The Court finds error in the ALJ's determination that all of the IQ scores were not valid, as discussed below.

[28] Tr. 32, 74

[29] Tr. 399, 443.

[30] Tr. 447.

[31] *See, e.g*, *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) (relying upon evidence that plaintiff struggled through special education classes, dropped out of ninth grade and had trouble reading, writing and with math); *King v. Barnhart*, No. 1:06-cv-0381-DFH-TAB, 2007 WL 968746, at *3 (S.D. Ind. Feb. 26, 2007) (finding claimant to have deficits in adaptive functioning where he was incapable of independently managing funds, and where he relied upon friend for transportation despite managing to get a driver's license after having the driver's test orally read to him).

[32] *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) (citing *Henrie v. U.S. Dep't. of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir. 1993); 20 C.F.R. § 404.944); *see also Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983).

**B. Validity of IQ scores**

Under the second criteria for Listing 12.05C, Plaintiff must also show that he has a *valid* verbal, performance or full scale IQ score in the range of 60 through 70. As noted above, the IQ tests administered by Drs. Smith and Moeller in 2008 and 2010, respectively, rendered one or more scores within the requisite range of 60 through 70. In July 2009, however, Dr. Schell administered an IQ test which rendered scores that were not within the requisite range: a verbal score of 81, a performance score of 79, and a full scale IQ score of 78.

The ALJ found that none of these three IQ scores was valid, a decision that this Court determines was not supported by substantial evidence and thus was in error. The ALJ discredited the scores for three reasons: (a) the ALJ believed that Plaintiff's general level of function belied the scores; (b) the ALJ relied on Plaintiff's past gainful work to conclude that the scores weren't valid; and (c) the ALJ believed Plaintiff was malingering and generally doubted his credibility on all of his IQ tests.

**1. Plaintiff's General Level of Functioning.**

The ALJ stated, "[l]ooking at [Plaintiff]'s ability to describe his past work and his general level of function, such as his ability to take care of himself and shop independently, the original test scores are not believed to be valid."[33] The ALJ further noted that Plaintiff's described daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." The ALJ noted that Plaintiff had no difficulty with personal care, prepared his own meals, did household chores, shopped, and handled his financial

---

[33]Tr. 17.

affairs.[34]  From this evidence, the ALJ concluded that Plaintiff's IQ scores were not believable.  But, the ability to live independently, and to engage in household chores, shopping, and self-care, is not at all inconsistent with the mild mental retardation of someone with an IQ score within the 60 through 70 range, per Listing 12.05C.  For there is a distinction between Listing 12.05D, which renders disabled persons with mild mental retardation that results in marked limitations or repeated episodes of decompensation, and Listing 12.05C, which renders disabled persons with mild mental retardation who have at least one other physical or mental impairment that imposes an additional and significant work-related limitation.  Thus, under Listing 12.05C, the ability to engage in daily activities does not have the evidentiary materiality that it has under listing 12.05D.  For this reason, a number of courts, like this court, have rejected the argument that ability to engage in daily activities means one does not meet Listing 12.05C.[35]  The ALJ erred in determining that the IQ scores were invalid based on Plaintiff's ability to live independently and engage in household chores, shopping, and self-care.

### 2. Plaintiff's Past Gainful Employment

In finding the IQ scores invalid, the ALJ also improperly relied upon the fact that Plaintiff has gainfully worked in the past.  For a past history of work does not otherwise negate a claimant's fulfillment of the requirements of the listing.  As the court noted in *Durden v. Astrue*,[36] someone with mild mental retardation may manage to hold an unskilled job despite his

---

[34]Even if ability to engage in daily activities were probative and material under listing 12.05C, the ALJ's finding that Plaintiff was capable of managing his schedule with a planner ignores substantial evidence that despite having the planner, Plaintiff struggled to keep the planner updated and accurate.  As a consequence, Plaintiff struggled with keeping medical appointments.

[35]*See Gross v. Astrue*, No. 2012 WL 2449900, at *8–10 (D. Kan. June 26, 2012) (citing, *inter alia*, *Markle v. Barnhart*, 324 F.3d 182 (3d Cir. 2003)).

[36]586 F. Supp. 2d 828, 838 (S.D. Tex. 2008).

or her intellectual limitation, but when faced with an additional impairment, be unable to work. Indeed, as the Tenth Circuit has noted, recognizing this possibility is the very purpose of Listing 12.05C.[37] Listing 12.05C recognizes that someone with IQ scores within the range, and who suffers from a severe physical or other mental limitation, is disabled, irrespective of past work history.

### 3. Plaintiff's Credibility

The ALJ found that Plaintiff was not credible at all, because his described activities and past work history were inconsistent with having mild mental retardation. This was error. It appears that the ALJ's determination that the IQ scores were invalid and that Plaintiff was not credible were largely based on the report of Dr. Moeller, even though Plaintiff's IQ scores under the tests administered by Dr. Moeller were lower than those in the tests administered by Drs. Smith and Schell. In administering the Minnesota Multiphasic Personality Inventory (MMPI-2), which includes nine validity scales inherent to that test, Dr. Moeller saw indications that Plaintiff might be exaggerating his impairments. Based on his testing, Dr. Moeller opined that he could rule out "reading difficulty, confusion or random responding" as reasons for the scores on the validity scales, and thus it appeared that Plaintiff was malingering. Thus convinced that Plaintiff was malingering, Dr. Moeller then undertook to administer three tests for malingering: the Structured Interview of Malingered Symptoms (SIMS), the Miller-Forensic Assessment of Symptoms Test (M-FAST), and the Test of Memory Malingering (TOMM).

Based on these tests, Dr. Moeller concluded that Plaintiff was malingering. Dr. Moeller characterized the scores on the SIMS test as "one of the most elevated profiles I have ever seen."

---

[37]*Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997).

Dr. Moeller characterized the TOMM test as "an objective way to assist differentiation of genuine, memory-impaired individuals from those attempting to falsify a presentation of impaired memory." Dr. Moeller found, based on the TOMM test, that to a reasonable degree of probability, Plaintiff's poor performance was the result of an attempt to malinger a memory deficit. But the results of the M-FAST test did not indicate malingering. As Dr. Moeller characterized it, the M-FAST test indicated that "96 times out of 100, Mr. Bradley would be identified as a genuine patient and [0.65] times out of 100 he would be identified as a malinger by this instrument.

The ALJ expressly gave great weight to the opinion of Dr. Moeller that the IQ scores were not valid and that Plaintiff was malingering and not credible. But the Court finds a number of errors in the ALJ's assessment. First, the malingering tests were inconclusive, in the sense that one of the three tests showed very little likelihood of malingering. Second, with respect to the validity scales, Dr. Moeller ruled out the possibility that Plaintiff had difficulty in reading. Yet, Dr. Schell, who administered not only IQ tests, but aptitude tests, determined that Plaintiff had a reading ability at the fourth grade level and was probably dyslexic.

Third, and perhaps most importantly, it is against the policy of the Social Security Administration to purchase these malingering tests, much less place great weight on them. In its Policy Operations Manual System (POMS), the Social Security Administration directs ALJs and staff not to purchase malingering tests, including SIMS and TOMM, as part of a consultative examination for mental impairments,[38] because "[w]hile the test results from these tests can provide evidence suggestive of poor effort or of intentional symptom manipulation, results from

---

[38] POMS No. DI 22510.007(D)(2).

such instruments are not programmatically useful in resolving the issue of credibility of an individual's statements."[39]  Moreover, the Social Security Administration cautions that "[y]ou cannot prove malingering with tests; there is no test, that when passed or failed, conclusively determines the presence of inaccurate patient self report.  Even a high likelihood of malingering does not preclude severe limitations resulting from a genuine MDI [medically determinable impairment]."[40]

The Social Security Administration's reticence to use or rely on these tests is well taken, given the controversy about the efficacy of these tests when administered to persons with mild mental retardation or low intellectual functioning.  Plaintiff filed an appendix of scholarly articles critical of the efficacy and accuracy of malingering tests administered to patients with mild retardation or subaverage intellectual functioning.  These articles point out a number of studies that show the weakness of these malingering tests with that population, and the need for more research into ways of effectively testing those with lower intelligence or cognitive impairments.[41]

Thus, the Court finds problematic the ALJ's heavy reliance on Dr. Moeller's opinion, which in turn, heavily relied upon the malingering tests he administered.  Dr. Moeller noted other indicia that caused him to question Plaintiff's credibility, and the ALJ, in determining that Plaintiff was not credible, relied upon these indicia as well as some inconsistent statements by

---

[39]*Id.*

[40]*Id.*

[41]*See* Anne L. Shandera et al., *Detection of Malingered Mental Retardation*, 22 PSYCHOL. ASSESSMENT 50, 50 (2010)*;* Kolleen E. Hurley & William P. Deal, *Assessment Instrument Measuring Malingering Used With Individuals Who Have Mental Retardation: Potential Problems and Issues,* 44 MENTAL RETARDATION 112, 112 (2006); Lili O. Graue, et al., *Identification of Feigned Mental Retardation Using the New Generation of Detection Instruments: Preliminary Findings,* 21 CLINICAL NEUROPSYCHOL. 929, 929 (2007).

Plaintiff.  Among the behaviors that Dr. Moeller and the ALJ relied upon were that when Plaintiff presented to Dr. Moeller, Plaintiff was wearing a black leather jacket when it was 106 degrees outside, and that Plaintiff tended to pant and breathe heavily and exhibit problems with exertion, even while smugly smiling and appearing to watch for Dr. Moeller's reaction to this. Dr. Moeller considered this theatrics by Plaintiff.

Yet this was not the first time that Plaintiff had been noted to be dressed inappropriately. On October 15, 2008, the police brought Plaintiff to the crisis office at COMCARE of Sedgwick County for a screening; Plaintiff was wearing a silver helmet, a jacket and several shirts.  In the middle of summer, on July 16, 2009, Plaintiff wore blue jean overalls and a leather coat to his appointment at COMCARE and removed the coat only after "much coercing" by his therapist. And Plaintiff presented to Dr. Smith wearing a "silver helmet with earphones and lights that looked abnormal to observers."  This of course, may be emblematic of the poor judgments Plaintiff makes about appropriate attire in hot weather, or it may be emblematic of eccentric behavior.  But it might also be emblematic of Aspberger's Syndrome, a mild form of autism, which Dr. Schell opined that Plaintiff had.  Yet, during his testing and examination, Dr. Smith found Plaintiff's behavior otherwise appropriate, and specifically found that he "appeared open and honest, and I have no reason to doubt his credibility."

Moreover, other evidence in the record shows that Plaintiff at times rode his bike to medical appointments with treating providers during hot weather, presenting with signs of fatigue, heavy breathing, and disheveled dress.  Dr. Moeller also thought that Plaintiff purposely inaccurately completed a concentration task, to spell the word "world" backward, and found it significant that Plaintiff was able to correctly determine the amount of change he would be due

in a hypothetical transaction.  Yet, Plaintiff had consistently told Dr. Smith that he could count change and pay bills when he has the opportunity.  Dr. Moeller also thought suspect Plaintiff's manner of using his cane.

Although the ALJ made his own determination of credibility, as he should, he largely relied upon Dr. Moeller's findings that Plaintiff was malingering, as well as Dr. Moeller's clinical observations as described above.  At the same time, the ALJ inexplicably ignored the assessments of Drs. Schell and Smith, that based on their clinical observations, Plaintiff was cooperative and was making an adequate effort when they administered their tests; but, as Dr. Schell described, Plaintiff had "poor concentration, easy distractibility, stress and frustration," from his clinical observation.

The ALJ is to make his own credibility determination based on a review of the entire record.  As the Tenth Circuit has explained, "[c]redibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence."[42]  For the ALJ must make a finding on the credibility of the statements, based on consideration of the entire case record, and that findings as to credibility should be closely and affirmatively linked to substantial evidence.[43]

The Court finds that there is not substantial evidence supporting the ALJ's credibility determination.  It does not appear to this Court that the ALJ considered much evidence other than Plaintiff's ability to perform daily activities, the fact that Plaintiff had been able to work in the past, as well as the inconsistency between Plaintiff's explanation for why he left his last job

---

[42]*Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).

[43]*Jones v. Astrue*, 500 F. Supp. 2d 1277, 1288–89 (D. Kan. 2007).

and the employer's statement that Plaintiff had simply stopped coming to work. The ALJ also relied on the behavior that Dr. Moeller found suspicious. Yet much of the "suspicious" behavior is explained by other record evidence: there is other evidence of Plaintiff wearing inappropriate clothing in hot weather, or strange clothing in other circumstances. There is evidence that Plaintiff rode his bike to medical appointments, which would explain why Plaintiff was panting and breathing heavily when he presented to Dr. Moeller on a day when it was 106 degrees outside.

Moreover, the ALJ, while placing great weight on Dr. Moeller's use of malingering tests, contrary to Social Security Administration policy, virtually ignored the assessments of Drs. Smith and Schell, that Plaintiff was credible and made an adequate effort when they administered their battery of tests. The ALJ gave no weight to the opinion of Dr. Schell and only limited weight to the opinion of Dr. Smith, despite the fact that all three doctors were consulting psychologists who rendered opinions based on testing, examination, and review of records. In fact, the ALJ erroneously gave no weight to Dr. Schell's opinion because the ALJ incorrectly believed that Dr. Schell's opinion was based solely on Plaintiff's subjective complaints. Although Dr. Schell took an extensive psychosocial history from Plaintiff, his findings were largely based on objective evidence. In fact, Dr. Schell administered the same IQ tests as the other doctors, but also tested Plaintiff's educational aptitude. Based on the Luria-Nebraska Neuropsychological Battery test, Dr. Schell found a "likelihood of brain dysfunction, including scores at the critical and severe level for motor functions and arithmetic, and scores at the severe level for tactile functions, reading, intellectual processes and pathognomic. He also found that Plaintiff had a GAF score of 35, placing him in the range of major impairment, 31-40. Dr.

Schell's other material findings were that Plaintiff has "a severe disturbance in executive functioning and cannot plan or carry out complex tasks [and] a severe problem with task completion: severe problems with poor concentration, limited persistence, and slow pace." Finally, despite the higher IQ scores in the tests he administered, Dr. Schell found that Plaintiff had significant limitations in memory, and sustained concentration and persistence. These findings could properly be based on the testing Dr. Schell performed. The ALJ erred by failing to consider these findings.

Dr. Smith, who also performed IQ tests and a mental status examination, found that Plaintiff

> is likely to have some difficulty understanding and following simple instructions in new settings, though he may function adequately in simple and familiar settings and tasks. Due to his short-term memory problems and depression, he is likely to have difficulty working persistently at tasks. I see no reason he would be unable to maintain appropriate relations with others. He should be able to manage benefits.[44]

On substantial evidence review, the Court finds the ALJ erred in rejecting the 2008 and 2009 IQ tests solely on the basis of Dr. Moeller's findings in 2010. This decision is not based on substantial evidence because it is overwhelmed by other evidence in the record. The ALJ did not appropriately evaluate the opinions of Drs. Smith and Schell with reference to other evidence in the record aside from Dr. Moeller's report. Not only are Dr. Moeller's malingering tests inconclusive (the Miller-Forensic Assessment indicates no malingering), even if the IQ scores in that test were the product of malingering, there is no evidence that Drs. Smith and Schell

---

[44]Tr. 340–41.

rendered opinions based on exaggerated symptoms or malingering.[45]  Thus the ALJ used an erroneous basis for his decision to give great weight to Dr. Moeller, and limited or no weight to the opinions of Drs. Schell and Smith.[46]  In short, the ALJ erred in giving great weight to the opinions of Dr. Moeller, and in discrediting the opinions of Drs. Schell and Smith, because the ALJ did not properly consider the *Goatcher* factors and relied upon both improper factors and factors not supported by substantial evidence.

### 4. Borderline Intellectual Functioning

In spite of the ALJ's failure to credit to the IQ tests, the ALJ determined that Plaintiff had borderline intellectual function and appeared to conclude that this determination precluded Plaintiff from qualifying for Listing 12.05C.  This in incorrect; even the ALJ's conclusion that Plaintiff has borderline intellectual functioning does not preclude a determination that he met the capsule definition and other requirements of listing 12.05C.  The Social Security Administration did not employ the DSM definition of mental retardation for listing 12.05C.  Instead, it opted for a more flexible standard, which incorporated the essential elements of multiple, but widely used, definitions of mental retardation.[47]  For this reason, a number of courts have found that someone

---

[45] *See Langley v. Barnhart,* 373 F.3d. 116, 1121 (10th Cir. 2004) (finding ALJ erred in rejecting treating doctor's opinion as based solely on subjective complaints, when clear that doctor's opinion based on objective, clinical evidence); *Victory v. Barnhart*, 212 F. App'x. 819, 822–23 (10th Cir. 2005) (holding ALJ erred in rejecting treating doctor's opinion as based solely on subjective complaints, ignoring fact that doctor did medical examinations, tests, and reports.)

[46] In *Goatcher v. U.S. Dep't of Health & Human Servs*., the Tenth Circuit directed the ALJ to consider the following factors in determining what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.   52 F.3d 288, 290 (10th Cir. 1995) (citing 20 C.F.R. § 404.1527(d)(2)–(6)).

[47] *See* 67 Fed. Reg. 20,018, 20,022 (Apr. 24, 2002).

with "mild mental retardation"[48] or "Borderline to Low Average range of intelligence,"[49] as well as IQ scores within the listed range, meets the capsule definition.[50] A formal diagnosis of mental retardation is not required to satisfy the listing requirements of 12.05C,[51] and a diagnosis of "borderline intellectual functioning" under the DSM-IV does not preclude a determination of disability under listing 12.05 for mental retardation.[52]

## V.   Conclusion

For these reasons, the Court concludes that the ALJ erred in finding Plaintiff not disabled at step three. Thus, the Court reverses and remands the decision of the Commissioner. The ALJ shall evaluate Plaintiff under Listing 12.05C, shall develop the record with respect to manifestation of mild mental retardation before the age of 22, and shall properly evaluate the opinions of Drs. Schell, Smith, Moeller, and any other consulting medical professionals the ALJ deems appropriate.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the decision of the Commissioner be **REVERSED** and judgment be entered in accordance with the fourth sentence of 42 U.S.C. 405(g) **REMANDING** the case for further proceedings consistent with this opinion.

---

[48]*See Harrold v. Astrue*, 299 F. App'x 783, 788 (10th Cir. 2008).

[49]*See e.g*, *Devoe v. Barnhart*, No. 3:05cv746(MRK)(WIG), 2006 WL 1272614, at *6 (D. Conn. Mar. 15, 2006) (finding that plaintiff met the capsule definition based on examiner's description of plaintiff's IQ scores as within the borderline to low average range of intelligence, and on the fact that two of plaintiff's three test scores fell squarely within the 12.05C range).

[50]*See also* 67 Fed. Reg. at 20,018-01.

[51]*Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).

[52]*See Bishop v. Barnhart*, No. 04-4078, 2005 WL 946560, at *7–8 (D. Kan. Mar. 15, 2005); 67 Fed. Reg. at 20,022.

**IT IS FURTHER ORDERED** that upon remand, the Commissioner shall evaluate Plaintiff under Listing 12.05C, including developing the record with respect to manifestation of mild mental retardation before the age of 22, as well as conduct a proper evaluation of the opinions of Drs. Schell, Smith, Moeller, and any other consulting medical professionals the ALJ deems appropriate.

**IT IS SO ORDERED.**

Dated: November 21, 2012

                                          S/ Julie A. Robinson

                                          JULIE A. ROBINSON

                                          UNITED STATES DISTRICT JUDGE